### BROWN v. BROWN.

No. 13617.

Court of Civil Appeals of Texas. Dallas.

June 22, 1945.

Cunningham, Lipscomb & Cole, of Bonham, for appellant.

J. P. Copeland, of Wolfe City, for appellee.

YOUNG, Justice.

This appeal is from the court's judgment of divorce in favor of appellee (plaintiff below), on ground of adultery; defendant's contest raising the issue of condonation. His petition, filed August 21, 1944, set forth a marriage in Fannin County on May 19, 1942, and the birth of a child, Effie Brown, aged about fifteen months. He had entered military service in December, 1942, coming home on furlough in April, 1943, returning to camp April 24 of that year; alleging that he came back on leave fourteen months later, or June 26, 1944, and found defendant pregnant by another man, such conduct on her part rendering their further living together insupportable. Defendant, as stated, interposed the statutory defense of cohabitation, plaintiff allegedly having knowledge of the prior offense.

Errors presented are (1) that said judgment is against the great weight and preponderance of testimony, in that undisputed evidence established that the misconduct, if any, of defendant had been condoned, and (2) the court failed to make provision for support of the minor child, Effie Brown, as required by Art. 4639a, Vernon's Ann. Civ.St. These points necessitate a brief review of material facts.

Plaintiff, a soldier, somewhere in the United States or overseas at time of trial, did not testify in person or by deposition.

Lizzie Brown, mother and witness in his behalf, was corroborated in the main by Albert Brown, a brother. She testified that plaintiff came in from Maryland on ten days' furlough, June 26, 1944, starting back to camp July 5; that he spent the first four nights with defendant at home of witness (mother), following which he did not live with defendant; that after the fourth night she heard Joe tell Hazel "she was pregnant and it wasn't none of his" * * * "he said he didn't want her and wasn't going to live with her any more * * *"; that he did not stay with her that night, but got in car and left. Previous to that time witness had heard no disturbance or cross words between the two; defendant wearing loose clothing and her condition "very prominent". Lizzie further related circumstances of defendant sending word that she wanted to see Joe; of his going over there later at night, and upon return showed witness a razor he had taken from under defendant's pillow. On the point at issue, Albert Brown stated:

"Q. Did you hear any conversation between him and his wife about living together? A. Yes, sir, I heard him tell her that he didn't want her.

"Q. What else did he tell her about being pregnant? A. He said he didn't want her after he found out she was that way.

"Q. After he found out he didn't want her any more? A. Yes, sir. * * *

"Q. After he told her that over at your house he didn't go back with her any more? A. No, sir, not to my remembrance, no, sir.

"Q. And several days after that then, about the 5th of July, he left back for the camp in Maryland? A. Yes, sir.

"Q. From the time he told her that until the time he left he didn't go back? A. Yes, sir."

Appellant Hazel Brown testified that the second child was born October 1, 1944, she having written appellee about her condition before his visit of June 26, sending him money to come home on; that she had cohabited with defendant during the several nights of his furlough, either at her home or his father's; that no differences arose over her pregnancy, they going on and living together as husband and wife; that Joe had even promised to carry her back East, but "after he got all my money I borrowed, he said I couldn't go." As to the razor incident, defendant said: "I

thought maybe he was going to bother me and I wasn't going to let him bother me—fighting me. Court: Why did you think he might fight you? A. People told me so many tales on him I thought he was going to try to whip me when he come home but he didn't, and I just carried it for my protection." A letter received from plaintiff in an envelope postmarked August 4, 1944, stated that he might be going overseas, suggesting a ten-day furlough if sent expenses. Defendant was drawing an $80 monthly allotment and an additional $35 per month for the first child, Effie Brown. J. D. Brown, plaintiff's father, stated that he had financed both of plaintiff's trips back home, the latter attempting to secure an attorney for purpose of divorce before leaving, and that, by request, witness completed such arrangement.

■ Article 4630, Vernon's Ann.Civ.St., provides: "In any suit for divorce for the cause of adultery, if it shall be proved that the complainant * * * has admitted the defendant into conjugal society or embraces after he or she knew the criminal fact, * * * it shall be a good defense and a perpetual bar against said suit." An essential element of the above statutory defense (condonation) is full knowledge of the charged misconduct; or at least "such knowledge as would satisfy a reasonably prudent person that the offense had been committed, giving full weight to the trust and confidence which husband and wife are entitled to place in each other." See Editor's note, 109 A.L.R. 683, citing many American decisions.

■ Obviously, under the present record, defendant's infidelity cannot be denied; her sole defense being plaintiff's cohabitation, with full knowledge of the prior dereliction, establishing condonation in law. It is our view, however, that aforesaid issue was one of fact for the trial court, who has rejected the defense on conflicting testimony. Even in matters of divorce, much deference must be given the conclusions of the trial judge as respects credibility of witnesses, perforce of his first-hand observation of their deportment and demeanor on the stand. 15 Tex.Jur. § 89, p. 557. Art. 4633, Vernon's Ann.Civ.St., reads in part: "where the husband or wife testifies, the court or jury trying the case shall determine the credibility of such witness and the weight to be given such testimony." The effect of this proviso is that in divorce proceedings the weight of all testimony is a

matter for determination by the trial court alone. 15 Tex.Jur., supra. In consequence, he was authorized to disregard the defensive version of facts and accept that on behalf of plaintiff, whereby full knowledge of the prior misconduct would not be inferred until after the stated fourth day of his aforesaid furlough.

As regards sufficiency of evidence to support the decree, it is undoubtedly true that the full and satisfactory requirement of Art. 4632 extends to the appellate court as well. Our authority of revision, however, is not without limitation; in which connection the rule is stated in Mortensen v. Mortensen, Tex.Civ.App., 186 S.W.2d 297, 304: "that this court may examine the statement of facts to determine whether or not the evidence is full and satisfactory. In so doing, we are not necessarily bound by the trial court's findings although they are entitled to great deference by this court. When, however, in making this examination, we are confronted by testimony of one witness which is directly contradicted by that of another witness, we must accept the trial court's decision upon the point, as we possess no authority to pass upon the credibility of witnesses and the weight to be given their testimony. As to these matters, the untrammelled decision of a conscientious trial judge is more to be desired than his estimate or guess as to how the cold written record of a trial may impress an appellate court." See also Moon v. Moon, Tex.Civ.App., 186 S.W.2d 362, 363, holding: "However, where there is conflict in the testimony, and the credibility of the witnesses and the weight to be given their testimony is primarily involved, in the absence of the showing of an abuse of discretion by the trial court, its findings of fact will not be disturbed on appeal. Article 4633, R.C.S., 1925; Kreiter v. Kreiter, Tex.Civ.App., 137 S.W.2d 184; Bell v. Bell, Tex.Civ.App., 135 S.W.2d 546; Blackburn v. Blackburn, Tex.Civ.App., 163 S.W. 2d 251."

Allegations of the trial pleadings were sufficient as to residence of the minor child, Effie Brown, awarded by consent to defendant, Clare v. Clare, 138 S.W.2d 220; such statutory requirement in matter of child support, under Art. 4639a, being satisfied by government allotment admittedly drawn by the mother monthly for such purpose. And the court, though failing to otherwise dispose of the last mentioned issue, is not precluded from hereafter making further provision for the child upon showing of changed conditions, such as plaintiff's resumption of civilian status. Townsend v. Townsend, Tex.Civ.App., 115 S.W.2d 769.

The judgment appealed from must be affirmed.

BOND, C. J., dissents.

BOND, Chief Justice (dissenting).

The parties to this suit are negroes, hence their acts and conduct detailed in this record may well be adjusted to their station in life, degree of refinement and sensibilities, together with all attending circumstances.

The statutory rules applicable to condonation of adultery create a greater bar and are of much greater effect than condonation for other divorce causes. Ordinarily, condonation of misconduct, as here, may be concluded from circumstances of cohabitation, or resumption of connubial relation. To this may be added acts and conduct of the parties exhibiting forgiveness. Condonation, particularly among the colored race of the South, in forgiving and forgetting infidelity, demonstrates ante-bellum thought and action of the 1860's where birth of children out of wedlock was legally and morally sanctioned. Many instances of infidelity among the colored race pass without notice, and the offending party is not condemned, or ostracized by church, society or fraternal associations. Be it to their credit that they subscribe to the doctrine: "He that is without sin among you, let him first cast a stone at her."

The evidence in this case is undisputed. On October 1, 1944, the defendant gave birth to a baby; sometime prior to June 26, 1944, plaintiff was advised by his wife that she was pregnant, and when he came home on furlough, arriving June 26, 1944, leaving July 5, 1944, he and defendant lived and cohabited together in connubial relation. Clearly, if defendant was guilty of alleged adultery, of which the evidence raises a doubt, the plaintiff condoned the offense.

Lizzie Brown, mother of plaintiff, testified:

"Q. The girl gave birth to a baby pretty soon after he was here on furlough? A. Yes, sir, October 1st and he left on the 5th of July.

"Q. She had had one baby before that? A. Yes, sir, * * *.

"Q. Now, the girl's condition was evident; anybody could tell she was in a family way? A. Yes, sir.

"Q. You knew that long before your son came home? A. Yes, sir.

"Q. And he wasn't blind or anything the matter with his eyes? A. No, sir.

"Q. He slept in the same bed with her right in your house four or five nights after he come home? A. Four nights. * * *

"Q. She was wearing sweaters, coats and loose blouses? A. Yes, sir.

"Q. She would wear all those sweaters, loose blouses and coats on account of her condition? A. Yes, sir.

"Q. It was very prominent then? A. Yes, sir.

"Q. You could tell she was going to have a baby right away? A. Yes, sir.

"Q. It was pretty cold wasn't it? A. No, sir, it was warm enough for young folks to be out but she kept them on.

"Q. They never had any disturbance? A. Not a cross word. * * *"

Albert Brown, brother of plaintiff, testified:

"Q. Did you hear any conversation between him (plaintiff) and his wife about living together? A. Yes, sir, I heard him tell her that he didn't want her.

"Q. What else did he tell her about being pregnant? A. He said he didn't want her after he found out she was that way. * * *."

Cross-examination: "Q. How long a furlough did he have? A. It was seven days I believe.

"Q. He stayed at least four nights with your father didn't he, and mother? A. Yes, sir.

"Q. And they ate at the table with the balance of the family? A. Yes, sir.

"Q. Went to bed in a room by themselves? A. Yes, sir.

"Q. Wasn't but one bed in that room was there? A. Yes, sir, that's all. * * *

"Q. You saw him kiss her good bye when he went to Washington, didn't you? A. No, sir.

"Q. Was she at the train or bus? A. He caught the bus I think when he left.

"Q. She was with him when he caught the bus wasn't she? A. I believe so.

"Q. And they was all in good humor and never had any fusses or fights? A. No, sir, not any fights.

"Q. And stayed there happily all during this furlough? A. Yes, sir, he— * * *.

"Q. She stayed with her husband constantly during the time he was here on the furlough? A. Yes, sir. * * *

"Q. You say they rode around in the car together? A. Yes, sir.

"Q. Was that before you heard him say he wouldn't stay with her? A. Yes, sir. * * *"

J. B. Brown, father of plaintiff, and the party who instituted this suit, testified:

"Q. At the time the defendant here, Hazel, and Joe were living together at your house those four nights there was no complaint between them in any way was there? A. Not at that time; I didn't hear anything.

"Q. No disturbance or fussing and quarreling? A. No, sir.

"Q. All seemed to be happy and getting along fine? A. Yes, at that time."

Hazel Brown, the defendant, waiving immunity under Art. 4633, R.S., on call as a witness by plaintiff, gave evidence (on cross-examination):

"Q. When your husband was home on a furlough where did you all stay during that time? A. We stayed part of the time at my house and part of the time at his father's.

"Q. How long did you stay at his father's house? A. We stayed there about four nights. * * *

"Q. Prior to this time had you written him a letter about your condition? A. Yes, sir, I wrote and told him about the condition I was in.

"Q. Then he got a furlough and came home? A. Yes, sir.

"Q. After you explained to him the condition, did you furnish him any more money from time to time? A. Yes, sir, I furnished him money all the time.

"Q. Had you and he had any trouble or difference between you? A. No, sir, we didn't have no trouble.

"Q. When he came home and found your condition what, if anything, did he have to say or do about it? A. Well, he didn't have nothing to do about it.

"Q. He went on and lived with you as man and wife? A. Yes, sir.

"Q. At your parents and at his parents? A. Yes, sir. * * *

"Q. Did you stay together at night anywhere except at your parents and his parents? A. No, sir. * * *.

"Q. Did you all have any trouble or difference until up to the time he went back to Washington? A. No, sir.

"Q. Was anything said about you going back with him? A. Yes, sir, he promised me that he was going to let me go back with him. * * *

"Q. Did you live with him as his wife after he knew all about your pregnant condition? A. Yes, sir.

"Q. And had sexual intercourse with him? A. Yes, sir.

"Q. Do you have any letters from him? A. Yes, sir.

"Q. Since he has been back? A. Yes, sir, I got a letter from him twice since he has been back.

"Q. When did you get the last letter from him? A. I've got it right here; I got it on August 4th.

"Q. Was that after he went back? A. Yes, sir.

"Q. Let me see the letter * * * Did this letter come in this envelope? A. Yes, sir.

"Q. And addressed to you, 'Mrs. Hazel Brown, Route 2, Box 60, Wolfe City, Texas', and says: 'From Pvt. Joe Brown, Walter Reed Hospital, new section, Forest Green, Maryland.' A. Yes, sir.

"Q. Did you and he have one child born before this last baby was born? A. Yes, sir."

At this juncture the defendant offered in evidence the envelope and letter above mentioned, reading:

"Mrs. Hazel Brown Dear Sweet hard Just a few to let you hear from me I am well and Hope you are the same I have your watch i have been Drill every every We are chatch Hell and I am get Ready to go over sea I can get ten day For lough if you send My fair I want to see you be for I go over So if you love me you will send it i want before 22 of this Mointh i am not gone to beg you for it if Cear ang thing about me you will send say Hazel you no I am gone over sea and I want to see you it might be the last Time i want to see the Baby to and i will Bring you watch home So Hazel dont let me Dont let me Down if you Do you dont love me i will close so be Sweet i will come home if you send my fair From" (On the back of the last sheet of the above is as follows) "From Pvt. Joe Brown."

The envelope also shows: "From Pvt. Joe Brown, Walter Reed Hospital, new section, Forest Green, Maryland" (Postage): "Free" (Postmarked): "Washington D. C. Aug. 4 11:30 AM 1944". (Addressed): "Mrs. Hazel Brown, Route 2, Box 60, Wolfe City, Texas."

It will be observed that J. B. Brown, father of the plaintiff, instituted this suit about two months after his boy had returned to camp in the State of Maryland, and that the boy's testimony, by deposition or otherwise, was not given on trial of this cause, and no reason is assigned for such failure. Brown testified that his boy had written him a letter authorizing him to bring the suit for divorce, but he did not offer the letter in evidence. He further testified that his boy, while on furlough, went to a Mr. Dooley at the Greenville Red Cross Office, and he, Dooley, sent him to Attorney Johnson to make arrangements to bring the suit, but Mr. Dooley was not offered as a witness. Hazel Brown testified:

"Q. Did you say anything to him (her husband) about your condition or divorce or not divorce at any time? A. Yes, sir, I told him when he was here I was pregnant and if he wanted to get a divorce to get it while he was here and he said he didn't want no divorce, he was going to live on with me.

"Q. After that did he live with you at your house and at his house? A. Yes, sir, stayed right with me."

A divorce should never be granted on pleas of adultery, as here, where the evidence shows conclusively that, with full knowledge of the facts, the husband forgave and forgot, continued marital cohabitation with his wife, and voluntarily renewed their connubial relation, thus condoning all wrongs, real or fancied, of which the wife may have been guilty. Indeed, the conclusion of the trial court, with respect to credibility of witnesses and weight to be given their testimony, is binding on appellate courts; but, where the testimony is uncontroverted, the judgment and conclusion of the trial court presents a question of law, and where the testimony is evidently not "full and satisfactory" on material issues, the action of the trial court in rendering judgment thereon, on appeal is for the appellate court's review to determine the

issue. In the light of this record, clearly the evidence is wholly lacking as being "full and satisfactory" to justify the divorce, hence this court should assume the responsibility for its determination. Aylesworth v. Aylesworth, Tex.Civ.App., 292 S. W. 963; Demmer v. Demmer, Tex.Civ. App., 289 S.W. 440, 441; Blake v. Blake, Tex.Civ.App., 263 S.W. 1075; Bain v. Bain, Tex.Civ.App., 252 S.W. 252; Hubbard v. Hubbard, Tex.Civ.App., 231 S.W. 160; Wiedner v. Wiedner, Tex.Civ.App., 231 S. W. 448; Parks v. Parks, Tex.Civ.App. 55 S.W.2d 242."

These parties and all witnesses are illiterate, humble negroes of the South; their testimony evinces doubt, prompted by leading and suggestive questions, as to the period of conception resulting in absence of access of the husband to the wife; and in doubt also as to the residence of the plaintiff to confer jurisdiction, or venue, of the suit in Hunt County. Otherwise their testimony is positive as to plaintiff's acts of condonation. The defendant and all witnesses reside in Fannin County; and, to establish residence of the plaintiff in Hunt County to confer therein jurisdiction of this cause, the only evidence comes from the father of plaintiff, who testified:

"Q. Where is he (plaintiff) located? A. Maryland.

"Q. Was he inducted into the army from Wolfe City, Hunt County, Texas? A. Yes, sir.

"Q. He joined the army, when? A. December 7, 1942.

"Q. Hunt County was his home at that time? A. Yes, sir, that's where he was staying and that's where he was drafted from."

Art. 4631, R.S., provides for maintenance of divorce suits in the county where plaintiff has resided for six months next preceding the filing of same; and where a citizen of this State is absent from this State for more than six months in the military or naval service, or other service of the United States or of this State, the suit may be maintained in the county where he had his residence before entering such service. It is clear that the father's testimony, as above quoted, as to the residence of plaintiff is indefinite; analyzing, he says that he (plaintiff) joined the army in 1942 and that Hunt County was the county "where he was staying" and drafted for the army. There is no testimony other than above that the plaintiff resided in Hunt County, or that he was "absent from the State six months" in the service, for which he may maintain the suit in Hunt County, Texas. Otherwise, the record in this case abounds with such uncertainty and lack of evidence to sustain the judgment, that a new trial should be accorded appellant. In consequence, the judgment should be reversed and remanded for further consideration for full and satisfactory evidence. I respectfully dissent to the affirmance of this case.